# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 5253 | **DATE** | 11/9/2001 |
| **CASE TITLE** | Deborah Rundle vs. Village of Round Lake Beach, et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

| | | |
|---|---|---|
| (1) | ☐ | Filed motion of [ use listing in "Motion" box above.] |
| (2) | ☐ | Brief in support of motion due _____. |
| (3) | ☐ | Answer brief to motion due_____. Reply to answer brief due_____. |
| (4) | ☐ | Ruling/Hearing on _____ set for _____ at _____. |
| (5) | ■ | Status hearing set for 11/26/2001 at 9:00 A.M.. |
| (6) | ☐ | Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____. |
| (7) | ☐ | Trial[set for/re-set for] on _____ at _____. |
| (8) | ☐ | [Bench/Jury trial] [Hearing] held/continued to _____ at _____. |
| (9) | ☐ | This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2). |
| (10) | ■ | [Other docket entry] Enter Memorandum Opinion And Order. Defendant's motion for summary judgment (35-1) is granted on all counts. Plaintiff's motion for leave to file supplemental complaint (29-1) is granted. At the next status conference, Plaintiff will be expected to advise the court which Defendants may be dismissed from the case as a result of this order. |
| (11) | ■ | [For further detail see order attached to the original minute order.] |

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | NOV 1 3 2001 | 47 |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 11/9/2001 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| ETV | courtroom deputy's initials | FILED FOR DOCKETING 01 NOV -9 PM 4: 55 | ETV mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

**DOCKETED**

NOV 1 3 2001

DEBORAH RUNDLE,                         )
                                        )
          Plaintiff,                    )
                                        )
     v.                                 )      No. 99 C 5253
                                        )
VILLAGE OF ROUND LAKE BEACH,            )      Judge Rebecca R. Pallmeyer
A Municipal Corporation; EDWARD         )
SINGLES; DENNIS ZIULEK; JAMES           )
SIMONCELLI; JOHN LAYCOCK; AND           )
GARY BITLER,                            )
                                        )
          Defendants.                   )

## MEMORANDUM OPINION AND ORDER

Plaintiff Deborah Rundle, a police officer, brings this action against her employer, the Village of Round Lake Beach (the "Village"), and individual defendants Edward Sindles, Chief of the Village Police Department (the "Department"); Department lieutenant John Laycock; former Deputy Chief James Simoncelli; and patrol officer Dennis Ziulek. Rundle alleges that the Defendants violated her constitutional rights to equal protection and free speech, intentionally inflicted emotional distress on her, and violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*, by creating a hostile work environment, engaging in or condoning sexual harassment, and retaliating when Plaintiff complained about the harassment to the EEOC. Defendants now move for summary judgment on each of Rundle's claims. Plaintiff moves for leave to supplement the original complaint. For the reasons set forth below, Defendants' summary judgment motion is granted.

47

Because the court also grants Plaintiff's motion to supplement her original complaint, the case will proceed with respect to those new claims only.

## FACTUAL BACKGROUND

**A.    Plaintiff's Employment History**

Rundle began working as a police officer for the Village on June 16, 1987, immediately after completing basic training. (Rundle Deposition, Ex. 1 to Defendants' Motion for Summary Judgment (hereinafter "Rundle Dep.") at 7.) She began her police career by working on an undercover drug investigation for her first few months on the force. (*Id.* at 35; Simoncelli Deposition, Ex. 2 to Defendants' Motion for Summary Judgment (hereinafter "Simoncelli Dep.") at 22.)  When this investigation ended, Rundle worked an afternoon shift for a short time and then spent three or four years on the midnight shift. (Rundle Dep. at 36.) After taking an exam and undergoing an interview, she was promoted from patrol officer to corporal in the fall of 1992 or 1993. (*Id.* at 10.) In 1993, soon after becoming a corporal, Rundle moved to the Department's Drug Abuse Resistance Education ("D.A.R.E.") Program, which she oversaw for three years.[1] (*Id.* at 37.) In 1996, Rundle returned to the midnight shift, and served as shift commander when the sergeant was off or on vacation. (*Id.* at 37-38.) While working, she was in a head-on car accident caused by a drunk driver on February 1, 1997. (*Id.* at 93.) Rundle, who was pregnant at the time, suffered back, hip, and knee injuries in the accident. (*Id.*)  She was put on leave for five weeks after the accident, before

---

[1]    The record does not indicate which shifts Plaintiff worked when doing the D.A.R.E. program.

2

working only light duty for six months in light of her pregnancy and lingering injuries, and then took maternity leave shortly before her child was born on October 27, 1997. (*Id.* at 93-4.) Rundle returned to duty after this leave,[2] and was promoted to sergeant in March 2000. (*Id.* at 423.) She was transferred from street duty to desk duty in February 2000, and alleges that she is no longer capable of returning to street duty because of medication that she is taking for depression and sleep disorders. (*Id.* at 422-23; 455-470.)

Rundle's professional record is not unblemished. She has been disciplined by the Department on at least five occasions. The first came on June 16, 1988, when she was suspended for two days for failing to properly search a prisoner. (*Id.* at 15-16.) Later, on a now-forgotten date five or six years into her police career, she was suspended for a day for driving her car into a post. (*Id.* at 17-18.) In January 1997, Officer Rundle served a three-day suspension for inappropriate MDT (Mobile Data Terminal) communications with fellow officer Ziulek, whom she had dated between July and November of 1996 while temporarily separated from her husband. (*Id.* at 18, 38, 59.) Rundle also received a two-day suspension in November of 1998 for "failure to act as a supervisor"[3] and misconduct relating to the release of confidential information about an applicant for a Department position. (*Id.* at 30, 323-27.) Finally, she was both

---

[2]    The record does not indicate the date of Plaintiff's return from maternity leave.

[3]    This is Rundle's own characterization of the reason for her suspension. (Rundle Dep. at 324.)

placed on administrative leave and suspended without pay for a month between December 11, 1998 and April 29, 1999 for having sexual intercourse with her subordinate, Officer Ziulek, in the conference room at the Department station.[4] (*Id.* at 103, 112, 333-34.) Plaintiff is uncertain of the exact date of this incident; Defendant Ziulek testified that it occurred on October 21, 1996. (*Id.* at 68; Ziulek Deposition, Ex. 5 to Defendants' Motion for Summary Judgment at 34.)

## B. Plaintiff's Sexual Harassment Concerns

Plaintiff alleges that she has been subjected to twenty sexually harassing episodes or actions since she began working at the Department in 1987. For clarity's sake, the court summarizes these allegations in chronological order.

### 1. 1987-90

Plaintiff alleges approximately 10 instances of sexual harassment during her first three years at the Department.

a. After plaintiff's Department swearing-in ceremony, defendant Laycock told Plaintiff that if he (i.e. Laycock) didn't like a woman on the police force, she would never make it at the Department. He then took a pair of pantyhose out of his desk drawer, and started shining his boots with it. (Rundle Dep. at 117-18.)

b. In approximately 1988, while working on an undercover drug operation, Plaintiff was under the supervision of Defendant Simoncelli, to whom she

---

[4] Plaintiff was put on administrative leave throughout the period from December 11, 1998 and April 29, 1999. The record does not specify precisely which thirty-day interval during this period constituted Plaintiff's unpaid thirty-day suspension.

4

was required to report the results of her undercover work. On one occasion at the end of the shift, Simoncelli suggested that they have a drink at a bar called "Fog Cutters," to discuss Plaintiff's work. While at the bar, they never talked about work. The discussion was not sexual, but was about personal matters, not professional ones, and left Plaintiff feeling uncomfortable. (*Id.* at 35, 118-121.) Plaintiff neither recalls specifics about the conversation nor specifies the source of her discomfort. (*Id.*)

      c.    On Thanksgiving morning of either 1988 or 1989, Plaintiff went to breakfast with Defendant Laycock and 12 to 15 other police officers from the Department and surrounding agencies. During breakfast, the officers began discussing their sexual experiences with female prisoners and matrons, as well as non-marital relationships. Laycock told a story about a stripper who came to the police station wearing only a coat. Laycock then turned to Plaintiff and said something to the effect of "Everybody here has a story, and we are not sure about you. What's your story?" (*Id.* at 122-25.)

      d.    Between 1988 and 1990, condoms were placed in Plaintiff's mailbox at work four or five times. (*Id.* at 127.)

      e.    In 1988 or 1989, when another female police officer named Jackie Grom was terminated from the Round Lake Heights Police Department, Defendant Laycock told Plaintiff that according to the guys on the shift, Plaintiff resembled Grom except that Grom "put out," and Plaintiff did not. (*Id.* at 128.)

      f.    In 1988 or 1989, Plaintiff began receiving prank telephone calls at home, mostly directed to her husband. The calls were insulting, sometimes using

profane names to refer to Plaintiff's husband or claiming that Plaintiff was having sex at work. (*Id.* at 154-55.) A trap was put on Plaintiff's line, which taped some of the harassing calls. Plaintiff also made a written complaint to her supervisors about the calls, and brought the tapes to then-Police Chief Ed Noe. (*Id.* at 155.) Plaintiff also recognized the voice of fellow officer Leroy Kuffel on one of the tapes. (*Id.*) Noe subpoenaed the phone records of everyone in the Department, and Kuffel's telephone records showed calls being made to Plaintiff's home. (*Id.*) Plaintiff asked Noe to suspend Kuffel for the maximum suspension time if he was determined to have done something wrong, and Noe agreed. (*Id.* at 156.) During the course of the departmental investigation of the matter, departmental Sgt. Ostertag came forward to say that he was with Kuffel at the dates and times in question. The departmental investigation was then abandoned.[5] (*Id.* at 156.)

g. In February 1989, Plaintiff and her husband went out to dinner at a colleague's house. While driving home from the party, Plaintiff saw Defendant Laycock following her in his squad car. When Plaintiff returned home, there was a voicemail message saying that she was having sex with the party's host.[6] (*Id.* at 159-

---

[5] It is not clear why Ostertag's comment disposed of the case. If he was acting as a kind of alibi for Kuffel for the times of the offensive phone calls, it is not clear why this evidence was not weighed against the record of the calls having originated from Kuffel's house and Plaintiff's suggestion that she recognized Kuffel's voice. The court notes that Ostertag's comment might do more to inculpate himself than to exculpate Kuffel.

[6] It is unclear whether the anonymous caller was intimating an extended affair or single sexual encounter between Plaintiff and the party's host.

60.)

      h.     In the fall of 1988, Plaintiff was leaving a Round Lake Beach police workout room with Mike Bach, a police officer from another department. Defendant Simoncelli, who was walking into the building at the time, commented on Plaintiff's long legs, and asked whether she would like to go to Hawaii with him. (*Id.* at 136.)

      i.     In 1988 or 1989, Defendant Laycock instructed Mike Bach that he should not talk to Plaintiff, because she was spending too much time on her midnight shifts talking to him. Bach reported this conversation to Plaintiff. (*Id.* at 138-39.)

      j.     Some time in 1988 or 1989, Defendant Laycock dispatched Plaintiff to a call of a bar fight. The standard procedure was that an assist car was always sent out on a fight call. Laycock told Plaintiff she should first go to the bar and decide whether she needed a cover, and then radio for it, if necessary. Bach overheard the call from his village, and responded to provide a backup for Plaintiff. (*Id.* at 142.)

**2.    1991-1992**

Plaintiff alleges four instances of sexual harassment during this period.

      k.     Sometime around 1991, an anonymous letter was placed in the mailboxes at the Department, stating that Plaintiff and a colleague had been seen having lunch together at a restaurant. Referring to Plaintiff's pregnancy, the letter asked "Whose baby do you really think it is?" (*Id.* at 129.) Plaintiff made a written complaint about the letter.[7] (*Id.* at 182.)

---

[7]     The court can find no other reference in the record to this complaint or
(continued...)

l.     During Plaintiff's 1991 pregnancy, she reported her condition to Defendant Simoncelli, who responded that her pregnancy created a great burden for the Department. When Plaintiff answered that the pregnancy was unplanned, Simoncelli suggested that she terminate the pregnancy. Simoncelli then said that the Village was not going to pay Plaintiff to be on light duty while pregnant. (*Id.* at 130.)

m.     Soon afterward, Simoncelli authored and distributed a new light duty policy, under which officers working light duty because of disabilities originating outside of work (including pregnancy) had their light duty assignment reviewed monthly. Before the policy changed, light duty was available whenever and for as long as it was needed. (*Id.* at 131-32.)

n.     After Plaintiff graduated from D.A.R.E. school in 1992, she was placed on the midnight shift for a year. When Plaintiff asked why she was not allowed to teach in the D.A.R.E. program, and was placed on a midnight shift that inconvenienced her and her three young children, she was never given an answer she believed adequate. (*Id.* at 142.) Although this allegation is not completely clear, Plaintiff appears to allege that the delay in shifting her to the D.A.R.E. program, and the assignment to the midnight shift constitute sexual harassment. Plaintiff was placed into the D.A.R.E. program in 1993, where she spent the next three years. (*Id.* at 142.)

---

[7](...continued)
to any Departmental responses thereto.

### 3. 1996-1997

o. At various times during Plaintiff's employment, she saw posters of scantily clad women on the walls in the Department weight room and squad room. In 1996, Plaintiff and a female dispatcher complained to Department Sergeant Judd about the posters and he took them down. The posters included a picture of a woman in hockey skates with pads covering her private areas, and photographs of actress Pamela Lee in a bikini. (*Id.* at 143-44, 536.)

p. In 1996, Plaintiff attended a picnic sponsored by the Fraternal Order of Police, the police union for the Department officers. According to Plaintiff, there was a beer fight at the picnic, during which Defendant Simoncelli poured beer on Plaintiff's chest. Plaintiff was wearing a swim suit top at the time. (*Id.* at 171-73.)

q. In early 1997, Defendant Simoncelli called into the police station while he was attending FBI school in Quartic, Virginia. Plaintiff, who was on light duty at the time, answered the telephone. Simoncelli said to Plaintiff, "So I hear you're pregnant again. Why would you do that to your body? You have a gorgeous body. Why would you want to get fat?" (*Id.* at 145.)

r. In December 1997, at the Village's Christmas party, while Plaintiff was sitting at a table with her husband and friends, Defendant Simoncelli came to the table, sat down, and asked Plaintiff if she was finished having babies. Simoncelli referred to Plaintiff as a baby machine. (*Id.* at 147-49.)

### 4. 1998

s. On March 18, 1998, while Plaintiff was in the sergeants' office

completing her activity log, Defendant Simoncelli came into the area and stared at her. Plaintiff asked Simoncelli why he was staring, and he answered, "Can't I look at you with love in my eyes?" (*Id.* at 147.)

t.  On the morning of April 29, 1998, after a meeting on the second floor of the Department, Plaintiff was bending over a desk in a hallway outside the conference room where the meeting was held. Simoncelli walked by, and Plaintiff alleges that he pinched her lightly on the buttocks. (*Id.* at 149, 194.) Simoncelli denies that any pinching took place, and states that he saw Plaintiff's handcuff case open, and snapped it shut. (Simoncelli Dep. at 52-56.) Plaintiff asked Simoncelli what he was doing, and he answered, "If Bill Clinton can do it, so can I." (Rundle Dep. at 151.) Simoncelli concedes making this comment, but testified that it was intended as a comparison between what he considered Clinton's sexual harassment of a student intern and his own non-sexual conduct toward a colleague. (Simoncelli Dep. at 55-56.)

## C.  Plaintiff's Retaliation Concerns

On April 30, 1998, the day after Simoncelli allegedly pinched her, Plaintiff made a written complaint to Defendant Sindles, the Department Chief. (Ex. A to Defs.' Local Rule 56.1(a)(3) Statement In Support of Their Motion for Summary Judgment (hereinafter "Defs. Local Rule Statement").)  The complaint described Simoncelli's alleged pinching and the March 18, 1998 episode in which Simoncelli allegedly stared at Plaintiff and asked "Can't I look at you with love in my eyes?" (*Id.*)  Plaintiff filed a sexual harassment charge with the EEOC on November 9, 1998. (Ex. E to Plaintiff's Response to Defendants' Motion for Summary Judgment (hereinafter "Plaintiff's

10

Response").) Plaintiff alleges that as a result of these sexual harassment complaints, she suffered eight acts of retaliation, which the court summarizes in chronological order.

1. <u>Questions about Reimbursement</u>. In May, 1998, Plaintiff requested a week's worth of compensation for time spent on a trial that settled on the first day of trial. (Rundle Dep. at 310-312.) Village policy allowed officers to be on call during trials which might require their testimony. (*Id.*) When Plaintiff submitted her request for compensation to her direct supervisor, Sgt. Judd, a question was raised about why Plaintiff had requested a full week's compensation for a trial that was resolved on the first day. (*Id.*) After Plaintiff explained that she was not notified about the guilty plea that ended the trial, her request for compensation was then approved.[8] (*Id.*) Plaintiff's harassment allegation is somewhat unclear, but it appears to derive from the Department's failure to promptly inform her that her case had settled and the scrutiny that was paid to her unwittingly ill-informed request for compensation.

2. <u>Refusal to Rescind Order Prohibiting Plaintiff from Taking Her Service Weapon Home</u>. On May 28, 1998, Plaintiff asked Sgt. Judd to rescind an October 3, 1996 order prohibiting Plaintiff from taking her duty weapon home when she finished her shift. (*Id.* at 307, 309.) Plaintiff wanted to save time by eliminating otherwise unnecessary trips to the police station when her work assignment required her to depart from home and go directly to court with her weapon. (*Id.* at 308.) Although the

---

[8]     The record does not reflect whether Plaintiff received compensation for a single day or for a full week.

record is somewhat unclear on this point, Plaintiff appears to contend that her request was denied. (Laycock Memo re: Request to Take Department Owned Firearm Home With Officer, Ex. C to Defs.' Local Rule Statement.) In responding to Plaintiff's request, Defendant Laycock noted that Plaintiff's personnel file contained a September 29, 1996 McHenry County Police Report stating that Plaintiff's husband had threatened to kill himself with Plaintiff's service revolver. (*Id.*) The report was generated by a McHenry County Police Officer who responded to a 911 call from Plaintiff. (Ex. D. to Defs.' Local Rule Statement.) Laycock's memo also noted that McHenry Lieutenant R. Donohue had asked that the weapon not be released to Plaintiff during her off hours because of the trouble that might ensue for "the Corporal, her husband, her children and the McHenry city Police Officers."[9] (Ex. C to Defs' Local Rule Statement.)

3. <u>Suspension for Release of Information</u>. On November 28, 1998, Plaintiff was given a three-day suspension (later reduced to two days) for her connection to the release of information about an applicant for a police job with the Village. (Rundle Dep. at 329.) Department Officer John Galason told other officers that Todd Thurmond, an officer with another police department, had filed a job application which disclosed a prior arrest for traffic offenses. (Scott Memo re Release of Thurmond's Information, Ex. E to Defs.' Local Rule Statement.) It was determined that Plaintiff later divulged to Thurmond that Galason had gotten access to Thurmond's file and told

---

[9]     The record before the court does not include a copy of this request.

12

others about his arrest.  (*Id.*)

4.     Placed on Administrative Leave.  On September 28, 1998, Department

Officer Gregory Vanco informed **Defendant Laycock** that at least two officers on the

midnight shift were contemplating leaving the department because of the way Plaintiff

supervised them on the midnight shift.  (Sindles Deposition at 33 (hereinafter "Sindles

Dep."); Department Laycock Memo re Unbecoming Conduct, Ex. F to Defs.' Local Rule

Statement.)   Laycock interviewed the dissatisfied officers, prepared a report, and

arranged for them to meet with Defendant Sindles.  (Ex. F to  Defs.' Local Rule

Statement.)   When interviews disclosed that Plaintiff had had a 1996 affair with

Defendant Ziulek, he was interviewed and admitted that he and Plaintiff had sexual

intercourse in the police station.  (Sindles Dep. at 41.)   Sindles reported the

investigation to the Village administration and recommended that an outside

investigator look into the situation and handle any disciplinary action arising out of

it.  (*Id.* at 41.)  The Village hired attorney William Cogley in this capacity, and he

proceeded to interview Plaintiff, Ziulek, and others.  (*Id.* at 51.)  Plaintiff and Ziulek

both confirmed that they had had sexual intercourse in the police station.  (Rundle

Dep. at 335; Ziulek Deposition at 22.)  Based on the investigation, Sindles filed charges

against Plaintiff and Ziulek.  (Sindles Dep. 107-08.)  While the charges were pending,

Plaintiff was placed on paid administrative leave and Ziulek was not.  (*Id.* at 57.)

Plaintiff concedes that having sex with a subordinate in the police station was

inappropriate.  (Rundle Dep. at 335.)  Citing the two-year interval between her affair

with Ziulek and the Village investigation, however, Plaintiff contends that the

investigation and her subsequent punishment were in retaliation for her harassment complaints. (*Id.* at 336-37.) Plaintiff concedes that she has no reason to believe that the Department's decision to discipline her more harshly than Ziulek was anything other than a consequence of the fact that she was Ziulek's supervisor. (*Id.* at 367.)

5.  <u>Disparate Punishment</u>.  Cogley continued the prosecution against Plaintiff and Ziulek.  Ziulek ultimately entered into a settlement agreement under which he was given a 20-day paid suspension.  Plaintiff agreed to a 30-day suspension without pay.  (*Id.* at 333, 344.)  Plaintiff believes that she and Ziulek should have received the same punishment, and that the disparate punishment was unfair retaliation.  (*Id.* at 367.)  Defendant Sindles testified that Plaintiff's conduct with Ziulek violated not only her responsibility for her own actions but also her supervisory responsibility to see that her subordinates' actions fall within rules and regulations. (Sindles Dep. at 19-20.)

6.  <u>Heightened Criticism of Plaintiff's Work</u>.  In September 1999, Plaintiff was transferred to the afternoon shift.  (Rundle Dep. at 315-16.)  Some time between November 12th and 19th, Department Lieutenant Bitler summoned Plaintiff to discuss 12 or 13 complaints about her that had been received from other Department officers. (*Id.* at 316.)  Among the complaints were Plaintiff's unawareness of how to obtain a subpoena; her allowing male officers to answer radio calls while pretending to be Plaintiff; her improper handling of evidence; and her submitting incomplete reports. (Department Bitler Memo re Job Performance, Ex. N to Plaintiff's Response to Defendants' Motion for Summary Judgment.)  Plaintiff received no oral reprimand,

14

suspension, or discipline as a result of the complaints. (Rundle Dep. at 403). Plaintiff alleges that the complaints were used as "aggravation" during a subsequent disciplinary hearing in which she was found not guilty. (*Id.* at 403-04.)

7.    <u>Placed on Desk Duty</u>. Plaintiff was transferred from street duty to desk duty in February 2000. (*Id.* at 422.) Plaintiff alleges that this was an instance of retaliation for her complaint about Defendant Simoncelli. (*Id.* at 423.) At the time, Plaintiff was told that her transfer occurred because she was incompetent. (*Id.* at 422.) The following month, March 2000, she was promoted to sergeant. (*Id.* at 423.) She was the only remaining person on the promotion list at the time. (*Id.*)

8.    <u>Charges for Malfeasance</u>. On March 28, 2000, Defendant Sindles filed charges for three acts of malfeasance against Plaintiff. (Sindles Letter Filing Charges with the Round Lake Beach Police & Fire Commission against Deborah Rundle, Ex. G to Defs.' Local Rule Statement.) The charges were for attempting to erroneously dispose of a January 28, 2000 complaint that later led to an arrest for two counts of Criminal Sexual Abuse; failing to use an emergency channel to contact all police units with information during the February 10, 2000 pursuit of armed suspects, resulting in the escape of the suspect; and failing to maintain custody and control of an offender while assisting in a case on February 15, 2000. After an evidentiary hearing, the Commission found in Plaintiff's favor on all three charges.[10] (Rundle Dep. at 452; Sindles Dep. at 96.)

---

[10]    The record does not indicate the date of either the evidentiary hearing or the Commission's ruling.

## DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also CelotexCorp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Alexander v. Wisconsin Dep't of Health and Family Servs.*, 263 F.3d 673, 680 (7th Cir. 2001). A genuine issue of material fact exists "only if there is sufficient evidence for a jury to return a verdict for that party." *Alexander*, 263 F.3d at 680, *citing Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999)). When making this determination, the court must examine the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *Alexander*, 263 F.3d at 680.

### B.    Statutes of Limitations and Continuing Violations

Before ruling on this summary judgment motion, the court must first consider Defendants' contention that many of Plaintiff's allegations are time-barred.  Both § 1983 and Title VII impose time limits for complaints: the statute of limitations for § 1983 claims filed in Illinois is two years, *see* 735 ILCS § 5/13-202; *Henderson v. Bolanda*, 253 F.3d 928, 931 (7th Cir. 2001), while under Title VII, hostile environment claims must be filed with the EEOC within 300 days of the alleged harassment, *Shanoff v. Illinois Dep't of Human Servs.*, 258 F.3d 696, 701 (7th Cir. 2001).  Plaintiff

filed her charge of discrimination with the EEOC on November 9, 1998 and filed her complaint in federal court on August 12, 1999. Applying the appropriate statutes of limitations, Plaintiff's § 1983 claim extends to wrongs suffered between August 12, 1997 and August 12, 1999, and her Title VII claim extends to discrimination suffered between January 13 and November 9, 1998. Seventeen of Plaintiff's twenty allegations arose before the § 1983 limitations period; the eighteenth occurred within the § 1983 period, but before the Title VII limitations period.

Plaintiff argues that under the continuing violation doctrine, she may still obtain relief for otherwise time-barred acts of discrimination. Courts applying the doctrine consider a series of acts as a single connected chain ending within the statutory limitations period. *Selan v. Kelly*, 969 F.2d 560, 564 (7th Cir. 1992). The Seventh Circuit has noted that for the doctrine to apply in employment discrimination cases, "the various [alleged] acts must be reasonably close to each other, in time and circumstances." *Garrison v. Burke*, 165 F.3d 565, 570 (7th Cir. 1999).

The court concludes that the majority of Plaintiff's allegations do not warrant application of the continuing violations doctrine. Plaintiff alleges no instances of sexual harassment between 1993 and 1995. This two-year gap suffices to bar fourteen of the potentially time-barred allegations (allegations identified as (a) through (n) in this opinion) from being deemed part of any continuing violations. *See Garrison*, 165 F.3d at 570 ("two year lull" supported finding of no continuing violation). Plaintiff's fifteenth allegation (identified as (o) above)--concerning the hanging of suggestive posters in the Department weight room and squad room--is insufficiently related to her

surviving allegations to be considered part of a continuing violation. The circumstances of this conduct are unlike those surrounding Plaintiff's other allegations.

For purposes of this decision, the court assumes (without deciding) that Plaintiff's last three potentially time-barred allegations (allegations (p) through (r) above)--her sixteenth through eighteenth--warrant application of the continuing violation doctrine. These complaints, like Plaintiff's two clearly timely allegations, focus on the actions and comments of a single officer, Defendant Simoncelli. The alleged events occurred in 1996 and 1997, on dates ranging from a mere one to eighteen months before the two statutory windows. Moreover, the court concludes that the alleged events (a comment about Plaintiff's "gorgeous body," the pouring of beer on her chest during a beer fight at a picnic; and a comment about her status as a "baby machine") are conduct that might "constitute, or be recognized, as actionable harassment only in the light of events that occurred later, within the period of the statute of limitations." *Galloway v. General Motors Serv. Parts Operations*, 78 F.3d 1164, 1167 (7th Cir. 1996). Accordingly, the court's legal analysis will address Plaintiff's sixteenth through twentieth allegations as if Plaintiff had filed timely charges concerning all of these allegations.

## C. Sexual Harassment Claims

The standard of proof for sexual harassment claims is essentially the same under § 1983 and Title VII, except that § 1983 plaintiffs must prove intent on the part of the harasser. *Murray v. Chicago Transit Auth.*, 252 F.3d 880, 887 (7th Cir. 2001); *King v. Board of Regents of University of Wisconsin Sys.*, 898 F.2d 533, 537-38 (7th Cir.

18

1990). Title VII is violated when workplace discrimination is permeated with discriminatory intimidation, insult, ridicule and insult that is sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Hertzberg v. SRAM Corp.*, 261 F.3d 651, 657-58 (7th Cir. 2001). In determining whether an employer's conduct is sufficiently severe or pervasive to constitute a violation, the court examines all of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Smith v. Sheahan*, 189 F.3d 529 (7th Cir. 1999), *citing Harris*, 510 U.S. at 23. Plaintiff must show that the workplace is both subjectively and objectively hostile. *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 693 (7th Cir. 2001).

Plaintiff alleges five instances of sexual harassment: 1) Defendant Simoncelli's pouring beer on her amidst a beer fight in 1996; 2) Simoncelli's 1997 comments about Plaintiff's "gorgeous body"; 3) Simoncelli's December 1997 comments about Plaintiff's status as a "baby machine"; 4) the March 18, 1998 exchange during which Simoncelli stared at Plaintiff and asked "Can't I look at you with love in my eyes?"; and 5) the April 28, 1998 encounter in which Simoncelli allegedly pinched Plaintiff's buttock and stated that "If Bill Clinton can do it, so can I."

As crass as the alleged events may have been, the court concludes that they are not objectively offensive enough to withstand summary judgment. In summarizing Title VII case law, the Supreme Court recently noted that "'simple teasing,' offhand

comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998). Allegations two through four, comments allegedly made over the course of a year, clearly are not repeated, threatening, or disruptive enough to be deemed sexual harassment. *See McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473, 480 (7th Cir. 1996) (three offensive statements made within three months insufficient to support sexual harassment claim). Although more troubling, Plaintiff's first and fifth allegations also fail to rise to the level of seriousness mandated by *Faragher*. *See Adusumilli v. City of Chicago*, 164 F.3d 353, 361-62 (allegations of teasing about waving at squad cars; ambiguous comments about bananas, rubber bands, and low-neck tops; staring and attempts to make eye contact; and four isolated incidents in which a co-worker briefly touched plaintiff's arm, fingers, or buttocks were insufficient to constitute sexual harassment); *Saxton v. American Tel. & Tel.*, 10 F.3d 526, 534 (7th Cir. 1993) (two incidents of supervisor's misconduct involving inappropriate remarks and impermissible touching did not give rise to actionable sexual harassment claim); *Weiss v. Coca Cola Bottling Co.*, 990 F.2d 333, 337 (7th Cir. 1993) (co-worker's incidents of unwanted touching, attempts to kiss, and placing "I love you" signs in plaintiff's workplace did not create hostile work environment). The alleged conduct directed toward Plaintiff clearly pales in comparison to conduct that the Seventh Circuit has deemed severe enough to create a hostile workplace. *See, e.g., Rizzo v. Sheahan*, 266 F.3d 705, 712 (7th Cir. 2001)

(comments expressing defendant's sexual desire for plaintiff's fifteen-year-old daughter constituted severely offensive conduct). In the case before the court, Simoncelli's alleged actions were rendered less threatening because they were performed in public places with other people nearby.[11] The beer-pouring episode occurred within the context of a picnic and beer fight, about which Plaintiff recalled "a few people pouring beers over a few people's heads." (Rundle Dep. at 176.)

The court concludes that Plaintiff's § 1983 and Title VII sexual harassment claims, Counts I and IV of her complaint, must be dismissed.[12]

## D. Retaliation Claims

### 1. Title VII Claim

Plaintiff alleges that Defendant Village has unlawfully retaliated against her for her April 30th complaint to Defendant Sindles and EEOC filing of November 9, 1998. A Title VII claim of retaliation requires the plaintiff to show "that [she] engaged in statutorily protected activity; suffered some adverse action by [her] employer; and that there exists a causal link between the protected expression and the adverse

---

[11] The court notes further that Plaintiff herself gave inconsistent accounts of the alleged pinching. In the complaint that Plaintiff filed with Defendant Rundle the day after the alleged pinching, she wrote that Simoncelli "pulled on [her] handcuff case, lightly pinching [her] twice while doing so." (Ex. A to Defendants' Local Rule Statement.) Yet in her deposition, she testified that the unwanted contact consisted of "[o]ne light pinch." (Rundle Dep. 194.) In this court's view, neither version suggests severe or pervasive misconduct.

[12] Because of its disposition of this case, the court need not address Defendants' arguments that qualified immunity and municipal immunity would bar even legally cognizable § 1983 claims against the individual Defendants and the Village and that Title VII preempts Plaintiff's § 1983 claims.

action." *Lalvani v. Cook County*, No. 00-1603, __ F.3d __, 2001 WL 1230782, at *4 (7th Cir. Oct. 15, 2001); *Rizzo*, 266 F.3d at 714. Plaintiff alleges eight forms of retaliation: (a) questions about her reimbursement; (b) a refusal to rescind an order to keep her gun at work; (c) a suspension for Plaintiff's conduct with regard to the release of information about a Department job applicant; (d) an administrative leave imposed upon Plaintiff; (e) a disparity between the punishments that Plaintiff and Officer Ziulek received for committing the same offense; (f) heightened criticism of Plaintiff's work after her sexual harassment complaints; (g) Plaintiff's transfer from street duty to desk duty; (h) three charges of malfeasance filed against Plaintiff by Defendant Sindles.

Plaintiff has failed to make out the requisite prima facie case. Several of her allegations fail to state cognizably adverse employer actions. Scrutinizing a request for reimbursement before granting it, transferring Plaintiff from street duty to desk duty, criticizing Plaintiff's job performance, and filing charges of malfeasance that result in neither reprimands nor punishment are not adverse actions as a matter of law. *See Krause v. City of La Crosse*, 246 F.3d 995, 1000-01 (7th Cir. 2001) (letter of reprimand without further job consequences and decision to shift employee from front office to back room were not adverse actions); *Sweeney v. West*, 149 F.3d 550, 556-57 (7th Cir. 1998) (two unfair reprimands without tangible job consequences not materially adverse employer actions); *Johnson v. City of Fort Wayne*, 91 F.3d 922, 932 (7th Cir. 1996) ("a materially adverse change in employment circumstances must be more disruptive than a mere inconvenience or an alteration of job responsibilities").

Moreover, with regard to the Department's refusal to rescind its weapon storage policy, the court notes that the alleged act of retaliation consisted of nothing more than preserving a 1996 policy that antedated Plaintiff's sexual harassment complaints by more than a year. Preserving the status quo hardly constitutes an employment action, much less a materially adverse one.

Plaintiff's three remaining allegations fail because there is no evidence of a causal connection between her protected sexual harassment complaints and the adverse action by her employer. In order to meet this requirement, Plaintiff must demonstrate that the Department "would not have taken the adverse action 'but for' the protected expression." *Adusimilli*, 164 F.3d at 363, *citing McKenzie*, 92 F.3d at 483. Under the facts alleged in this case, then, Plaintiff has the burden of showing that her suspension, administrative leave, and disparately stringent punishment resulted from Department retaliation. At first blush, the timing of these unquestionably adverse actions may weigh in Plaintiff's favor. The suspension for releasing information, for example, began on November 19, 1998, shortly after Plaintiff filed her initial November 9, 1998 charge with the EEOC. In addition, Plaintiff's administrative leave and disparate punishment were applied between December of 1998 and April of 1998, soon after the filing. This chronology does not tell the whole story, however. The court notes that the Department began investigating the release of job applicant information in mid-October, long after Rundle's April 30, 1998 complaint, and weeks before her EEOC filing. (10/19 Bitler Memo re Release of Thurmond's Information, and 10/20 Department Investigations Division Report, Ex.

E to Defs.' Local Rule Statement.) *See also Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1039 (7th Cir. 1998) (twelve week interval between complaint and firing insufficient to meet causation element of prima facie retaliation case). Similarly, the investigation that led to Plaintiff's administrative leave and disparately stringent punishment began on October 8, 1998, months after the April complaint, and weeks before the EEOC filing. (Ex. F to Defs.' Local Rule Statement.) The sequence of events may well provide more support for Defendants than for Plaintiff's argument.

Even drawing all reasonable temporal inferences in favor of Plaintiff, however, on the evidence before the court, no reasonable factfinder could conclude that retaliation was a but-for cause of the Department's disciplinary actions. Indeed, even if retaliation were not an issue in this case, it would be shocking to learn that a police department had <u>failed</u> to discipline an officer who had sex with a subordinate in the station house. Ironically, a police department that failed to punish such a commanding officer might open itself up to sexual harassment charges in the future, as well as potential problems ranging from insubordination to declines in safety and morale. Plaintiff offers no evidence that her administrative leave is anything but a conventional discipline for an undisputed lapse in professional judgment. Similarly, while Plaintiff alleges that the disparity between the sanctions placed on her and her subordinate is retaliatory, she provides no evidence to counter either the testimony or the common sense intuition that a superior officer is more culpable than her subordinate for wrongs jointly committed in the workplace. *See* Sindles Dep. at 19-20; *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1042 (7th Cir. 1993) (corporate policy

24

barring dating and punishing "supervisors who by virtue of their position are expected to know better" and not subordinates was not evidence of workplace sexual harassment). Finally, while Plaintiff's suspension in connection to the release of information from a job applicant's personal file presents a slightly more difficult case, Plaintiff still has not presented evidence to show a causal connection between the suspension and her complaints.[13]

The court concludes that Plaintiff has failed to meet her burden of production and dismisses her Title VII retaliation claim, Count V of her complaint.

## 2. First Amendment Claim

Claims under §1983 for retaliation in violation of the First Amendment require a three-part analysis. First the court must determine whether the plaintiff's speech was constitutionally protected. If so, plaintiff must prove that defendant's actions were motivated by the plaintiff's constitutionally protected speech. If the plaintiff can show that his protected speech was a substantial or motivating factor in the defendant's actions, then the defendant is given the opportunity to demonstrate that it would have taken the same action in the absence of the plaintiff's exercise of his constitutionally protected rights. *Kokkinis v. Ivkovich*, 185 F.3d 840, 843 (7th Cir. 1999). Plaintiff here can not prevail unless she establishes that Defendants would not have taken the

---

[13] The court notes further the Department's evidence that the job applicant whose former arrest was wrongfully revealed threatened a possible lawsuit against the Department. (Ex. E to Defs.' Local Rule 56.1(a)(3) Statement.) Plaintiff offers no evidence to counter or offset the inference that the Department had reason to discipline her for her role in helping such a threat to arise.

challenged actions "but for" the constitutionally protected conduct. *Thomsen v. Romeis*, 198 F.3d 1022, 1027 (7th Cir. 2000).

As noted above, Plaintiff's evidence does not establish causation or even any adverse employment action. In the context of First Amendment challenges to employment actions, the challenged adverse acts need not be "monstrous,"; instead, the acts "need merely create the potential for chilling employee speech on matters of public concern." *DeGuiseppe v. Village of Bellwood*, 68 F.3d 187, 192 (7th Cir. 1995). To be actionable, however, the challenged employer actions must be more disruptive than an inconvenience or change of professional responsibilities. *Id.* Plaintiff must be "made worse off" by the challenged actions. *Id.* Plaintiff's retaliation allegations fail in the constitutional Count for the same reasons they were legally inadequate in her statutory Count.

Without deciding the issue, the court further notes that it is far from clear that Plaintiff's allegations constitute constitutionally protected speech. A public employee challenging employer actions on First Amendment grounds only states a claim when her allegedly restricted speech addressed a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 146-47 (1983). In addition, the plaintiff's interests as a citizen "in commenting upon matters of public concern" must outweigh the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Educ. of Township High Sch. Dist. 205*, 391 U.S. 563, 568 (1968). The Seventh Circuit has held that both gender discrimination and

sexual harassment are matters of public concern. *Yatvin v. Madison Metro. Sch. Dist.*, 840 F.2d 412, 419 (7th Cir. 1988); *Marshall v. Allen*, 984 F.2d 787, 795 (7th Cir. 1993) (collecting cases). In this sense, Plaintiff's speech clearly addressed matters of public concern. Courts applying the *Connick-Pickering* test must do more than consider the general subject matter of speech, however, and "must. . . delve deeper into the precise content, form, and context of the speech that admittedly may be of some interest to the public." *Cliff v. Board of Sch. Comm'rs of City of Indianapolis*, 42 F.3d 403, 410 (7th Cir. 1994). In applying this analysis, the court must "look at the point of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?" *Callaway v. Hafeman*, 832 F.2d 414, 417 (7th Cir. 1987), *quoting Linhart v. Glatfelter*, 771 F.2d 1004, 1010 (7th Cir. 1985).

In this case, Plaintiff's speech "concerns a subject of public interest but the expression addresses only the personal effect upon the employee." *Marshall*, 32 F.3d at 1219. Plaintiff has offered no evidence suggesting that either her Department complaint or her EEOC charge pertained to workplace conditions for any other Department employee during the relevant time periods. The language of both complaints refers exclusively to herself and to workplace conduct that she has allegedly endured. (Ex. A to Defs.' Local Rule Statement; Ex. E to Plaintiff's Response.)

E.    **Intentional Infliction of Emotional Distress**

In addition to her federal claims, Plaintiff has alleged that Defendants

committed the tort of intentional infliction of emotional distress. Proof of such a claim has three elements: (1) the conduct involved must be truly extreme and outrageous; (2) the actor must intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress; and (3) the conduct must in fact cause severe emotional distress. *Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001). The court judges whether conduct is extreme and outrageous on an objective standard based on all the facts and circumstances of a particular case. *Van Stan v. Fancy Colours & Co.*, 125 F.3d 563, 567 (7th Cir. 1997). To serve as a basis for recovery, a defendant's conduct must be such that the "recitation of facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim 'Outrageous!'" *Doe v. Calumet City*, 161 Ill.2d 374, 641 N.E.2d 498, 507 (Ill. 1994), *quoting Restatement (Second) of Torts* § 46 cmt. D (1965).

In the employment context, Illinois courts have recognized that "personality conflicts, questioning of job performance and job transfers. . .are unavoidable aspects of employment." *Heying v. Simonaitis*, 126 Ill .App. 3d 157, 166, 466 N.E.2d 1137, 1144 (1984). Consequently, courts have limited recovery to cases in which the employer's conduct has been truly egregious. For example, intentional infliction of emotional distress occurred when an employer with knowledge of an employee's susceptibility to emotional distress proceeded to offer her money for sexual favors, and responded to her refusal by firing her and threatening to kill and rape her. *Pavilon v.*

*Kaferly*, 204 Ill. App. 3d 235, 245-47, 561 N.E.2d 1245, 1251-52 (1st Dist. 1990). *See also Briggs v. North Shore Sanitary Dist.*, 914 F. Supp. 245, 252 (N.D. Ill. 1996) (employee forced to withstand eight-hour exposure to toxic fumes stated intentional infliction claim).

In light of this demanding standard, federal courts applying Illinois law have denied recovery to plaintiffs alleging that their employers subjected them to a continuous series of discriminatory acts. *See Van Stan*, 125 F.3d at 568 (collecting cases). Thus, for example, the Seventh Circuit held that extreme conduct was not alleged by a plaintiff even though she contended that she had been prevented from supervising white employees, suffered reprimands without cause, was forced out of her management position, was promised a promotion that was never given, was excluded from office activities, had her telephone calls monitored with an eavesdropping device, and had her health and safety concerns ignored after her personal property was ignored on company property. *Harriston v. Chicago Tribune Co.*, 992 F.2d 697, 703 (7th Cir. 1993). *See also Briggs*, 914 F. Supp. at 252 (employer and fellow employee conduct consisting of hanging a pickaninny doll in plaintiff's office, subjecting her to racial slurs, excluding her from office social activities, placing her on probation, and refusing to train her properly did not rise to level of extreme and outrageous conduct). The court concludes that Plaintiff has failed to allege that Defendants' conduct was truly extreme and outrageous.

## F.   Supplementing the Original Complaint

Alleging numerous acts of employer retaliation since the filing of the original complaint, Plaintiff moves to supplement its original complaint. Although a supplemental pleading is separate and distinct from an amended pleading under Rule 15(a), the standard for allowing each is similar. *Glatt v. Chicago Park Dist.*, 87 F.3d 190, 194 (7th Cir. 1996). The court must consider whether granting leave to file the supplemental pleading will "promote the economic and speedy disposition of the entire controversy between the parties, will not cause undue delay or trial inconvenience, and will not prejudice the rights of any of the parties to the action." 6A C.A. WRIGHT, A.R. MILLER, & M.K. KANE, FEDERAL PRACTICE AND PROCEDURE §1504 (1990). In the case at hand, Plaintiff's proposed Supplemental Complaint adds a new Defendant, Department officer Gary Bitler, and alleges that Plaintiff has been repeatedly and discriminatorily retaliated against since the filing of her original complaint. The court is mindful of Defendants' concern that the addition of a new party may lead to new discovery and delay trial. At the same time, Plaintiff's new allegations merely update prior allegations of retaliation from the original complaint, and all supplemental allegations pertaining to Bitler occurred after the original lawsuit was filed. (Plaintiff's Reply to Defendants' Response to Plaintiff's Motion for Leave to File Supplemental Complaint at Law ¶¶ 1, 4, 5.) Requiring Plaintiff to initiate an entirely new action will do little to promote a timely or efficient resolution of this controversy. The court finds no reason to infer that Plaintiff is improperly attempting to delay this proceeding, given the short intervals between Plaintiff's February 14, 2001 EEOC retaliation charge, March 13, 2001 "Notice of Right to Sue," and May 24, 2001 motion

to file a Supplemental Complaint. The court grants Plaintiff leave to supplement her original complaint.

## CONCLUSION

For the reasons explained above, Defendants' motion for summary judgment (No. 35-1) is granted on all counts. Plaintiff's motion for leave to file supplemental complaint (No. 29-1) is granted. At the next status conference, Plaintiff will be expected to advise the court which Defendants may be dismissed from the case as a result of this order.

ENTER:

Dated: November 9, 2001

REBECCA R. PALLMEYER
United States District Judge